**WOODS, Housing Expediter, v. BAUHAN.**

**Civ. No. 11675.**

United States District Court
D. New Jersey.
May 24, 1949.

Sylvan D. Freeman, New York City, by Max W. Meisner, Newark, N. J. and Emory Gardiner, New York City, of counsel, for plaintiff.

William H. Campbell, Jr., Newark, N. J., for defendant.

FAKE, Chief Judge.

The complaint herein prays for a preliminary injunction to prevent defendant from violation of the Housing and Rent Act of 1947 as amended, 50 U.S.C.A.Appendix, § 1881 et seq. Upon this complaint an order to show cause was entered, in which order a temporary restraint was allowed and is still in full force and effect.

The question to be answered on the issues joined is whether or not certain premises known as 218-226 Millburn Ave., in Millburn, N. J. are subject to rent control under the provisions of the Housing and Rent Act of 1947, P.L. 129, 80th Congress, Sec. 202(c), 50 U.S.C.A. Appendix, § 1892(c), which, so far as pertinent, reads as follows: "The term 'controlled housing accommodations' means housing accommodations in any defense-rental area, except that it does not include * * * (3) any housing accommodations (A) the construction of which was completed on or after February 1, 1947 * * * except that contracts for the rental of housing accommodations to veterans of

World War II * * * the construction of which was assisted by allocations or priorities under Public Law 388, Seventy-ninth Congress, approved May 22, 1946, shall remain in full force and effect * * *."

It is conceded as pertinent or ultimate facts that the housing in question is within a defense-rental area and it was not completed until after February 1, 1947. The exact date of completion ranges somewhere between February 21, and May 20, 1947. For present purposes it is sufficient that the completion was accomplished after February 1, 1947.

It is contended by the plaintiff, Expediter, that this housing project falls within the exception of the statute above cited because its completion was "assisted by allocations or priorities" under Public Law 388 approved May 22, 1946, 50 U.S.C.A. Appendix, § 1821 et seq.

■ The defendant contends that no such assistance occurred and, therefore, the housing is decontrolled from rent regulations. Defendant points out that the act above cited recites that prolonged controls over rents would be inconsistent with the return to peacetime economy, and Congress declared its purpose to "terminate at the earliest practicable date all Federal restrictions on rents on housing accommodations." The plaintiff's argument takes over at this point and gives emphasis to the words following the above quotation, and they are as follows: "At the same time the Congress recognizes that an emergency exists and that, for the prevention of inflation * * * it is necessary for a limited time to impose certain restrictions * * * in defense-rental areas." The Act then says: "To the end that these policies may be effectively carried out with the least possible impact on the economy pending complete decontrol, the provisions of this title are enacted." 50 U.S.C.A. Appendix, § 1891. So far as recitals of intent may have a bearing on our problem, it would seem that the foregoing has a strong tendency to face both ways. However, the intent expressed in recitals should have no bearing in the absence of ambiguity. Our American courts are more

properly concerned with what Congress actually does or leaves undone, in its operative language, than with its recitals of intent. To manipulate in a literary realm with the question of intent in this case must of necessity result in an attempt to enter the field of legislation under the artifice of ultra-juristic dialectics. It is in the atmosphere of such pseudo-judicial philosophies that tyranny incubates government by men and not by law.

Thus it is clear that the basic problem for solution here radiates around the question as to whether assistance was rendered to this project under the provisions of P.L. 388, as the language first above quoted clearly indicates.

It is conceded that the application for permission to erect this building project was approved on April 10, 1946, under the provisions of P.R. 33, and was granted by the Civilian Production Administration, more than a month before P.L. 388 came into existence. The approval above mentioned carried with it all priorities necessary for completion of the project, and no further consents, priorities or other authorizations pertaining thereto were ever thereafter issued by any administrative or other agency of the Government. It might therefore appear, at once, that defendant's project was in no way assisted by P.L. 388. However, the solution is not quite so simple. Plaintiff argues with vigor that to place such a narrow construction on the meaning of the Act, P.L. 129 of 1947, 50 U.S.C.A.Appendix, § 1881 et seq., is to ignore the over-all intent of the Congress in its desire for the continuance of rent controls for veterans as expressed in P.L. 388. In other words that there never has been a break in the operation of P.R. 33, and that the powers thereunder passed to the Expediter under the provisions of P.L. 388 and thence to him under P.L. 129.

The point thus raised necessitates the tracing back of the factors involved to their respective sources. In this connection, P.R. 33 finds its inception in Executive Order No. 9638 of October 4, 1945, 50 U.S.C.A.Appendix, § 601 note, creating the Civilian Production Administration, and

vesting it with powers under which P.R. 33 came into effect on December 20, 1945.

Looking now again to P.L. 388, it is noted that Sec. 4(a) vests the Expediter with powers of allocation and priorities over materials in the public interest, (b) provides that in issuing regulations the Expediter shall give special consideration to (1) Veterans housing, (2) farm buildings, and (3) general housing requirements; then follow these words: "(c) The provisions of this section shall not be construed as in any way affecting the power of the President to assign priorities or to allocate any materials or facilities under the provisions of subsection (a) of section 2 of the Act of June 28, 1940, entitled 'An Act to expedite national defense, and for other purposes' (50 U.S.C. 633), as amended." 60 Stat. 210.

Therefore the President still retained control of P.R. 33, and it follows that the Veterans' Emergency Housing Act, P.L. 388, had no pertinent effect upon it, and priorities or allocations having their source in 50 U.S.C.A.Appendix, § 633 of 1940 remained in full force. This Act of June 28, 1940, 54 Stat. 676, 50 U.S.C.A.Appendix, § 1151 et seq., is entitled "An Act to expedite national defense, and for other purposes." Under it, as amended, the President issued Executive Order No. 8572, on October 21, 1940, which recites the creation of a "Priorities Board" by the "Council of National Defense," and approves the same vesting it with priority powers. This order was amended by Executive Order No. 8612, of December 15, 1940, to make all Army and Navy priorities mandatory. On January 7, 1941 Executive Order No. 8629 was issued revoking Order No. 8572 as amended, and creates the "Office of Production Management" within the "Office for Emergency Management of the Executive Office of the President," providing that it shall "determine when, to what extent, and in what manner priorities shall be accorded to deliveries of material as provided in Section 2(a) of the Act entitled 'An Act to Expedite National Defense and for other Purposes', approved June 28, 1940." No action affecting the instant project was taken under this order.

Next is found Executive Order No. 8875, of August 28, 1941. This provides that the "Office of Production Management" is, among other things "authorized and directed to discharge and perform the following responsibilities and duties, subject to such policies or regulations as the Supply Priorities and Allocations Board, hereinafter described, may from time to time determine," and to: "(d) Continue to perform the functions and exercise all the power, authority, and discretion conferred on the President by section 2(a) of the Act entitled 'An Act to expedite national defense and for other purposes,' approved June 28, 1940."

Next is Executive Order No. 9024, of January 16, 1942, which creates a "War Production Board" within the Office for Emergency Management of the Executive Office of the President. It provides:

"1. * * * the Board shall consist of a Chairman, to be appointed by the President, the Secretary of War, the Secretary of the Navy, the Federal Loan Administrator, the Director General and the Associate Director General of the Office of Production Management, the Administrator of the Office of Price Administration, the Chairman of the Board of Economic Warfare, and the Special Assistant to the President supervising the defense aid program.

"2. The Chairman of the War Production Board, with the advice and assistance of the members of the Board, shall: * *

"c. Perform the functions and exercise the powers vested in the Supply Priorities and Allocations Board by Executive Order No. 8875 of August 28, 1941.

"d. Supervise the Office of Production Management in the performance of its responsibilities and duties, and direct such changes in its organization as he may deem necessary."

Next we find Executive Order No. 9638 of October 4, 1945, 50 U.S.C.A.Appendix, § 601 note. This order creates the Office of Civilian Production Administration and vests it with "all functions and powers of the War Production Board, established by

Executive Order No. 9024 of January 16, 1942 * * *."

It was under this Order No. 9638 that the priorities (H.H.) we are concerned with in the instant case were issued, vesting defendants' predecessors with power and authority to obtain the material and things necessary for the completion of the building.

All the foregoing stem from the Second War Powers Act, 50 U.S.C.A.Appendix, § 633.

Having thus attempted to trace the authority under which the premises we are concerned with were completed, we come now to a consideration of the claim or position taken by the plaintiff, Expediter, in relation thereto.

It appears that on August 27, 1946, the Expediter, relying on the authority of P.L. 388, 79th Congress, issued a priorities regulation 5 (HEPR 5) to become effective on September 10, 1946, and after this date applications for priorities were no longer issued under P.R. 33.

P.L. 388, 60 Stat. 207, is entitled "An Act to expedite the availability of housing for veterans * * *," etc., and Section 1(a) thereof emphasizes the unfortunate position of veterans of World War II. However, under P.L. 129, of 1947, approved June 30, 1947, Congress enacted an Act called the "Housing and Rent Act of 1947." The title thereof differs in substance from the title of P.L. 388. It is entitled "An Act relative to maximum rents on housing accommodations; to repeal certain provisions of Public Law 388, Seventy-ninth Congress, and for other purposes." The provisions repealed strike out much of the emphasis that was given with respect to Veterans of World War II. Sec. 1(a) of P.L. 129 of 1947 provides:

"* * * That any allocations made or committed, or priorities granted for the delivery, of any housing materials or facilities under any regulation or order issued under the authority contained in said Act (P.L. 388), and before the date of enactment of this Act, with respect to veterans of World War II, their immediate families, and others, shall remain in full

force and effect." 50 U.S.C.A.Appendix, § 1881.

It is argued for the plaintiff, Expediter, that notwithstanding the foregoing quotation, it was the congressional intent not to permit any break or hiatus in the provisions of P.R. 33, and that P.L. 388, while containing no express language to that effect, was intended to take over the powers under P.R. 33. A reading of Sec. 1(a) of P.L. 129 indicates that if plaintiff's assertion is correct, and P.R. 33 becomes part and parcel of P.L. 388, then the plaintiff, Expediter, having made no regulation or rule to the contrary bearing on P.R. 33, it must be read into P.L. 388. Doing this we apply the language of the statute P.L. 129 above quoted, and find that P.R. 33 in the absence of any overt act, rule or regulation to the contrary is left as it was, and defendant's H.H. preference rating became a consummated license, subject of course to revocation before complete allocations were made. But in the instant case no express revocation appears nor am I able to spell out an implied revocation in view of the above statutory language which continues it in "full force and effect." But this is not all: We come again to P.L. 129 of 1947, Sec. 202(c) and it defines "controlled housing accommodations" and provides that it does not include "(3) any housing accommodations (A) the construction of which was completed on or after February 1, 1947 * * *." (As has been said the instant accommodations were completed after that date.) "* * * except that contracts for the rental of housing accommodations to veterans of World War II * * * the construction of which was assisted by allocations or priorities under Public Law 388 * * * shall remain in full force and effect; * * *."

This brings us again head on into the most important question involved in all this envolvement. Were the accommodations in question "assisted by allocations or priorities under Public Law 388"? As to priorities: Funk and Wagnalls gives a legal definition as follows: "A precedence or preference either in time or in right." Bouvier says of it: "He who has the precedency in time has the advantage in right,

is the maxim of the law." 1 Bouv.Law Dist. Rawle's Third Revision, p. 2707.

In the instant case the builder signed a certificate dated the 11th day of March, 1946, resulting in the use of the following certificate in obtaining materials:

"Reconversion Housing Program
Project Serial No. (66-031-1075)
Rating HH

I certify to the Civilian Production Administration that the materials covered by this order will be used only in a housing project being built under the Reconversion Housing Program at —— (give location of project), and that I will comply with the limitations on sales prices or rents and the preference to veterans provided in Priorities Regulation 33 and my approved application.

——————————

Builder"

The foregoing language is copied from P.R. 33. The signed originals I am informed cannot be found by either party. The practice was to stamp the same on invoices.

The certificate above mentioned was obtained pursuant to P.R. 33 on furnishing the required data relating to the project. The authorization to use the HH preference rating is in the following words: "Preference rating HH is hereby assigned for use in accordance with P.R. 33 in purchasing the minimum quantity of materials listed in Schedule A to PR 33 required for completion of 33 units of the project described herein. This rating does not apply to any other units unless specific authorization to that effect is issued by this office.

"Providing rentals for 3 room units do not exceed $78, 3½ room units $83 and 4 room units $88. 2, 2½ & 4½ room units approved as submitted."

As has been said, neither the Expediter nor any other government officer revoked the foregoing, and under it the materials furnished were obtained in each instance to final completion with no reference whatever to P.L. 388.

From the foregoing I am able to arrive at no other conclusion than that the priorities here were not only granted but eventually consummated by allocations under the provisions of P.R. 33 and not under the provisions of P.L. 388. It would therefore seem to follow, from what has been said, that the project in question was, in contemplation of law, de-controlled. However, again it is not so simple and we cannot rest here. It appears that on the 27th day of August, 1946, four certain orders or regulations were issued, two by the Housing Expediter, finding their sources in P.L. 388, and two by the Civilian Production Administration, having their sources in the Second War Powers Act as amended, 50 U.S.C.A.Appendix, § 633, as follows:

On August 27, 1946 the Housing Expediter issued E.P.O. #1 which vested the Civilian Production Administration with authority "to exercise the powers and authority of the Housing Expediter under Sections 4 and 7 of the Veterans' Emergency Housing Act of 1946 [60 Stat. 207]." Section 4 deals with priorities in futuro, and Sec. 7 deals with enforcement. On the same date the Housing Expediter also issued H.E.P.R. No. 5 which sets forth a long, comprehensive plan for allocations and priorities, and then provides that "this section does not apply to or affect applications filed under Civilian Production Administration Priorities Regulation 33 prior to the effective date (September 10, 1946) of this section or to any dwelling accommodations approved in such applications. Any supplemental applications or requests for changes in those applications which do not involve additional dwelling units shall be made in accordance with C.P.A. Priorities Regulation 33." In the present project no supplemental applications or requests were ever made. The building was completed under the original H.H. priority.

The Civilian Production Administration issued "Schedule A to P.R. 33 as amended" (August 27, 1946). The operative language is as follows: "Establishment of allocation and priorities system. Priorities for the delivery of the materials and facilities listed in paragraph (b) of this schedule are hereby established, and they may be allocated, under the Veterans'

Emergency Housing Act of 1946, as provided in this schedule and in other orders, regulations, directions, schedules and directives of the Civilian Production Administration."

This apparently resulted in a consolidation or an amalgamation of P.R. 33 with the powers under Housing Expediter Priorities Regulation 5, and other orders, regulations and directions of the Civilian Production Administration and of the Housing Expediter, so far as future action might be concerned. It contains no express reversals or revocations of prior grants. The Civilian Production Administration issued Directive 42, as amended (August 27, 1946) which authorized the Housing Expediter and the National Housing Agency: " * * * to perform the functions and exercise the power, authority and discretion conferred upon the President by the Second War Powers Act of 1942 and to perform the functions and exercise the power, authority and discretion conferred upon the Housing Expediter by the Veterans' Emergency Housing Act of 1946 with respect to the functions described below, and in so doing may impose such conditions and requirements and such terms as he may deem necessary and appropriate in the public interest and to effectuate the purposes of the Veterans' Emergency Housing Act of 1946."

It appears under paragraph (b), defining the scope of this directive, that it gives to the Housing Expediter all powers vested in the Civilian Production Administration appearing in Veterans Housing Program Order No. 1, dated March 26, 1946, which initially creates the Veterans' Emergency Housing Program as recommended by the report of the Housing Expediter to the President, dated February 7, 1946. This was before P.L. 388 and before the Veterans' Emergency Housing Program was initiated by Congress on May 22, 1946. It will be remembered that P.L. 388 was in large part repealed by P.L. 129 (1947) leaving, basically, only Sec. 10 thereof, 12 U.S.C.A. §§ 1738, 1739, 1743, continuing in force and effect. The latter section has no bearing here, and we again return to P.L. 129 upon which to rest our now weary

head. We must arouse ourselves, however, finally to answer the question as to whether or not the project in question was assisted by P.L. 388 during its lifetime. Apparently the Congress did not have a very high regard for it or it would not have so crippled it. Therefore, in considering it here as a factor bearing on the intent of Congress to continue its spirit in P.L. 129, it is of value only in emphasizing the fact that Congress intended to disregard it.

It is argued that it is quite unthinkable that the Congress, with its strong urge to aid the veterans of World War II, intended to leave the 4 veterans housed in this 33 unit project without any control over their landlord to hold their rents down. It would not be at all difficult here, functioning under a like urge, to enter the sphere of dialectics, ideologies and philosophies. This I cannot do for reasons hereinbefore stated.

Earlier herein consideration was given to the meaning of the word "priorities" as used in these statutes. It is noted that generally, if not in every instance, it is coupled with the word "allocations." The latter is defined by Funk and Wagnalls as a "setting apart." Thus it may be reasoned that the holder of a priority is given a right subsequently to have something set apart for his specific use. The holder of a priority, which is in its nature a license, is subject to revocation. When, however, the priority is matured by a physical allocation, as in the instant case, it becomes as fixed and irrevocable as is curtesy consummate in a husband in his deceased wife's estate. So here I find that the priorities, by subsequent allocations, in the absence of revocation, ripened into a vested right. It cannot be reasoned that because the government agents did nothing they did something which aided defendant under a specific act (P.L. 388). That act calls for action, not inaction, nor have I been able to find any statutory or other language which can be read as an express or an implied revocation.

The motion for a preliminary injunction is denied and the temporary restraint is lifted.